IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 6, 2012

**IN RE: DIXIE M. M.**

**Appeal from the Juvenile Court for Montgomery County**
**No. 164121     Kenneth R. Goble, Jr., Judge**

**No. M2012-01226-COA-R3-PT - Filed September 27, 2012**

Father appeals the termination of his parental rights. The trial court terminated Father's parental rights upon finding that four grounds for termination had been established – the grounds of substantial noncompliance with the provisions of the permanency plan, abandonment by willful failure to visit and support, and failure to establish parentage, and that termination of Father's rights was in the child's best interest. We have determined that three grounds for termination were established by the requisite proof and that termination of his rights is in the child's best interest. Therefore, we affirm the termination of Father's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

FRANK G. CLEMENT, JR., J., delivered the opinion of the Court, in which ANDY D. BENNETT and RICHARD H. DINKINS, JJ., joined.

Amy C. Bates, Clarksville, Tennessee, for appellant, Robert J. L.

Robert E. Cooper, Jr., Attorney General and Reporter; Derek C. Jumper, Assistant Attorney General, for the appellee, State of Tennessee Department of Children's Services.

**OPINION**

Robert J. L. ("Robert L.") is the biological father of Dixie M.M., the child who is the subject of this termination proceeding.[1] The parental rights of Dixie's mother have been terminated and Dixie's mother is not a party to this appeal.

---

[1]This Court has a policy of protecting the identity of children in parental termination cases by initializing the last names of the children, their parents, and the adoptive parents.

Dixie originally came into the custody of the Department of Children's Services ("the Department") in June 2009, due to child abuse of one of her four half-siblings by a paramour of her mother. Dixie's half-siblings, who are not children of Robert L., had previously been placed in foster care but were returned to their mother's care. When Dixie came into the custody of the Department, her half-siblings were returned to foster care.

Following the removal of Dixie and her half-siblings, a dependency and neglect hearing was held in September 2009, and Dixie and her half-siblings were adjudicated dependent and neglected. From the removal of Dixie until January of 2010, the Department believed the mother's paramour was the biological father of Dixie. Accordingly, Robert L. was not a party to that proceeding nor was Robert L. a party to the initial permanency plans.

In January 2010, Dixie's mother informed the Department for the first time that Robert L. could be Dixie's biological father. Thereafter, the Department located Robert L. and obtained DNA testing with his consent. The DNA test results, which were filed with the trial court in March 2010, confirmed that Robert L. (hereinafter "Father") was Dixie's biological father. Father was informed of the results and, in April 2010, Father agreed to participate in a permanency plan prepared by the Department for Dixie and Father.

Under Father's permanency plan, Father was required to have supervised visitation with Dixie for four hours each month; he was also required to provide his social security information, complete a parenting and clinical assessment and follow all recommendations, and obtain reliable transportation. Father completed the parenting and clinical assessments and provided the Department with his social security information; he was not as successful with the other initial requirements. A revised plan for Father was entered in November 2010, the sole goal of the revised plan was adoption.

Four months later, on March 18, 2011, the Department filed a Petition to terminate Father's parental rights on the grounds of substantial noncompliance with the provisions of the permanency plan, abandonment by willful failure to visit and support, and failure to establish parentage, and upon the basis that termination of Father's parental rights was in Dixie's best interest.

On December 5, 2011, Father's counsel filed a motion to establish his parentage as Dixie's biological father; this motion was never ruled upon by the trial court.

The petition to terminate Father's parental rights was tried on February 23, 2012. Several witnesses testified. Joy Mosley, Dixie's caseworker since June of 2009, testified that Father was residing in a trailer home when he was initially contacted by the Department. She

stated that she explained to him that his home needed working smoke detectors and a fire extinguisher and that she offered to assist Father in remedying these concerns, but he declined her offers. Ms. Mosley testified that Father complied with the visitation requirement in the permanency plan during May and June of 2010, which were therapeutic visitations in which transportation was provided for Father. However, Father's visitation with the child decreased after June. She further stated that between November 18, 2010, and March 18, 2011, the date on which the petition for termination was filed, Father had only participated in eight or nine visits. She explained that Father often cancelled visits, with little or no notice, and that she continued to offer to assist Father with transportation, but he did not request her assistance.

Ms. Mosley testified that after the petition was filed, Father was briefly denied visitation based upon an allegation of abuse against him made in April or May of 2011, however, it was later determined that the allegations were unfounded. In August 2011, Ms. Mosley contacted Father to see if he wanted to resume visitation; he responded stating that the foster parent had told him he was not permitted visitation. Ms. Mosley testified that she informed Father that he was permitted to have visitation and that she would schedule the visitation, but Father did not contact her about visitation until October 2011. Thus, she explained that no visitation occurred after May of 2011, despite her attempts to contact Father to schedule visitation.

Ms. Mosley also testified that Father was unemployed and received Social Security disability benefits as his sole source of income throughout these proceedings and Father had provided no meaningful support to Dixie or to the foster family.

Semecke Cobb, a Department Permanency Support Specialist, also testified; she stated that she assisted in supervising Dixie's case from April 2010 through February 2011, and during this period Father completed the clinical assessment, parenting assessment, and therapeutic visitation. Ms. Cobb stated that her main focus was helping Father obtain safe and stable housing. She testified that she spoke with Father once or twice each month in this endeavor, that she provided Father with applications for Section 8 housing, and offered to assist Father in obtaining services that would help make his home suitable for Dixie; however, Father refused all of her assistance, stating he would fix his home on his own. Ms. Cobb also testified concerning the minimal visitation by Father.

Tonya Fourqurean, a case manager for a private contractor hired by the Department, testified that she assisted in arranging visitation between Father and Dixie. Ms. Fourqurean stated that she arranged the therapeutic visitations between May and July of 2010, which occurred regularly, however, after July, Father frequently cancelled his visits. She also testified that, over time, she became the main contact person for Father's visitation, that she

informed Father he had visitation every Friday, provided that he call and confirm the visitation; however, Father mostly missed his visitation opportunities.

Ms. Fourqurean also testified regarding Dixie's interactions with her foster family, who had already adopted her four older half-siblings. She stated that Dixie was very attached to her foster family and referred to them as her parents and that Dixie was very close with her siblings. Ms. Fourqurean stated she believed it would be detrimental for Dixie to be separated from them.

Dixie's foster mother testified stating that Dixie was doing very well in her care and that she wished to adopt Dixie so she could reside with her siblings. She further testified that she never hindered visitation between Father and Dixie, and she only cancelled two visits due to inclement weather and sickness.

Father testified stating that he could only recall five or six visits with Dixie. He stated that he had one other daughter, who did not reside with him, and he acknowledged that he had little contact with that daughter.

He testified that he was unemployed and was unable to work due to a disability. Father stated that his only income was $698 per month in Social Security disability benefits, which was often insufficient to cover his expenses, and that he frequently borrowed money from his mother. Father also testified that since he became aware that he was Dixie's father, he had resided in four different residences, and he admitted refusing the assistance of the Department in obtaining suitable housing. At the time of the trial, Father was residing with an aunt and uncle of Dixie's and slept on their couch. He stated that, if he obtained custody of Dixie, she could live there with him and share a bedroom with two other children. Father testified that he would have a different residence as of March 1, 2012, rent for which would be over $400.

At the conclusion of the trial, the court took the matter under advisement. On March 21, 2012, the trial court entered an Order terminating Father's parental rights finding the Department had proven by clear and convincing evidence the grounds of substantial noncompliance with the provisions of the permanency plan, abandonment by willful failure to visit and support, and failure to establish parentage, and upon the finding that termination of Father's parental rights was in the best interest of the child.

This appeal followed, in which Father contends the evidence is insufficient to establish any of the grounds for termination or that termination is in Dixie's best interest. We shall discuss each contention in turn.

ANALYSIS

## I. STANDARD OF REVIEW

Parents have a fundamental right to the care, custody and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Hawk v. Hawk*, 855 S.W.2d 573, 577 (Tenn. 1993). This right is superior to the claims of other persons and the government, yet it is not absolute. *In re S.L.A.*, 223 S.W.3d 295, 299 (Tenn. Ct. App. 2006).

Parental rights may be terminated only where a statutorily defined ground exists. Tenn. Code Ann. § 36-1-113(c)(1); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). The petitioner has the burden of proving that there exists a statutory ground for termination, such as abandonment or failing to remedy persistent conditions that led to the removal of the child. *See* Tenn. Code Ann. § 36-1-113(c)(1); *Jones*, 92 S.W.3d at 838. Only one ground need be proved, so long as that ground is proved by clear and convincing evidence. *See In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003). In addition to proving one of the grounds for termination, the petitioner must prove that termination of parental rights is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(2); *In re F.R.R.*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re A.W.*, 114 S.W.3d 541, 544 (Tenn. Ct. App. 2003); *In re C.W.W.*, 37 S.W.3d 467, 475-76 (Tenn. Ct. App. 2000) (holding a court may terminate a parent's parental rights if it finds by clear and convincing evidence that one of the statutory grounds for termination of parental rights has been established and that the termination of such rights is in the best interests of the child). Therefore, a court may terminate a person's parental rights if (1) the existence of at least one statutory ground is proved by clear and convincing evidence and (2) it is clearly and convincingly established that termination of the parent's rights is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Whether a statutory ground has been proved by the requisite standard of evidence is a question of law to be reviewed de novo with no presumption of correctness. *In re B.T.*, No. M2007-01607-COA-R3-PT, 2008 WL 276012, at *2 (Tenn. Ct. App. Jan. 31, 2008) (no Tenn. R. App. P. 11 application filed) (citing *In re Adoption of A.M.H.*, 215 S.W.3d at 810).

## II. GROUNDS FOR TERMINATION

### A. SUBSTANTIAL NONCOMPLIANCE WITH THE PROVISIONS OF THE PERMANENCY PLAN

The first ground found by the trial court is failure to substantially comply with the obligations of the permanency plan as set forth in Tennessee Code Annotated § 36-1-

113(g)(2). In order to terminate upon this ground, the trial court must determine that the requirements were reasonable and related to remedying the conditions which necessitated the child's placement in foster care. *In re Valentine*, 79 S.W.3d at 547. The trial court must also determine that the parent's noncompliance with the requirements of the permanency plan was substantial. *In re M.J.B.*, 140 S.W. 3d 643, 656 (Tenn. Ct. App. 2004).

A key component of our analysis of this issue requires that we also determine whether the Department provided services reasonably necessary to assist Mother and Father in fulfilling their respective obligations under the permanency plans. *In re C.M.M.*, No. M2003–01122–COA–R3–PT, 2004 WL 438326, at *7-8 (Tenn. Ct. App. Mar. 9, 2004). In that regard, the Department's employees had an affirmative duty to utilize their education and training to assist the parent in a reasonable way to address the conditions that led to the children's removal and to complete the tasks stated in the plan.[2] *In re Giorgianna H.*, 205 S.W.3d. 508, 518-19 (Tenn. Ct. App. 2006); *In re J.L.E.*, No. M2004-02133-COA-R3-PT, 2005 WL 1541862, at *14 (Tenn. Ct. App. Jun. 30, 2005). Although the Department bears the responsibility to make reasonable efforts toward reunification, the road to reunification is a "two-way street." *State Dep't of Children's Servs. v. S.M.D.*, 200 S.W.3d 184, 198 (Tenn. Ct. App. 2006)). A parent desiring to be reunited with his or her children has a corresponding duty to "make reasonable and appropriate efforts to rehabilitate themselves and to remedy the conditions that required the Department to remove" their children from custody. *In re Giorgianna H.*, 205 S.W.3d at 519. Accordingly, although the Department bears a responsibility to facilitate reunification, it does not bear the entire responsibility. *Id.*

In this action, Dixie originally came into the Department's custody based on abuse of one of her siblings by her Mother's paramour and her Mother's failure to protect her from this abuse. Dixie's four siblings had previously been in the care of the Department demonstrating a need for Dixie to have a stable and supportive environment. Dixie was also unaware that Father was her biological father until the age of four. The provisions of the permanency plan developed by the Department were reasonably related to providing a stable environment for Dixie and developing a relationship between Dixie and Father. While Father

---

[2]Reasonable efforts are statutorily defined as the "exercise of reasonable care and diligence by the department to provide services related to meeting the needs of the child and the family." Tenn. Code Ann. § 37-1-166(g)(1). The factors the courts are to use to determine reasonableness include: (1) the reasons for separating the parents from their children, (2) the parents' physical and mental abilities, (3) the resources available to the parents, (4) the parents' efforts to remedy the conditions that required the removal of the children, (5) the resources available to the Department, (6) the duration and extent of the parents' efforts to address the problems that caused the children's removal, and (7) the closeness of the fit between the conditions that led to the initial removal of the children, the requirements of the permanency plan, and the Department's efforts. *In re Tiffany B.*, 228 S.W.3d 148, 158-59 (Tenn. Ct. App. 2007) (citing *In re Giorgianna H.*, 205 S.W.3d at 519) (footnote omitted).

initially complied with some of the provisions of the permanency plan by completing therapeutic visitation, completing the clinical and parenting assessments, and providing his Social Security information to the Department, Father failed to continue this cooperation as time went on and failed to comply with important provisions of the parenting plan such as maintaining regular visitation and maintaining stable and consistent housing suitable for a child. These two provisions of the permanency plan were the provisions that would directly impact the ability of Father to care for Dixie and the testimony of the three Department caseworkers demonstrated by clear and convincing evidence that Father failed to comply with these provisions and maintain a constant visitation schedule with Dixie or obtain a residence suitable for Dixie. The testimony at trial demonstrated that since becoming aware he was a father, Father had resided in four different residences. Further, the evidence was that Father had visited with Dixie on eight or nine times in the four months preceding the filing of the termination petition, and as of the final hearing, Father had not seen Dixie since fall of 2011. Both Ms. Mosley and Ms. Cobb testified that they offered assistance to Father in obtaining these goals, but Father did not accept their assistance. Therefore, we affirm the trial court's finding that the Department proved the ground of substantial noncompliance with the provisions of the permanency plan by clear and convincing evidence.

## B. ABANDONMENT

Tennessee Code Annotated § 36-1-113(g)(1) provides that a parent's parental rights may be terminated based upon the ground of abandonment. Abandonment is defined as when a parent "willfully failed to visit, . . . support or . . . make reasonable payments toward the support of the child for the period of four consecutive months preceding the filing of the petition to terminate that parent's rights." Tenn. Code Ann. § 36-1-102(1)(A)(i). The trial court determined that the Department proved two grounds of abandonment, one for his failure to visit Dixie and the other for his failure to support her. We agree with the trial court's finding that the Department proved by clear and convincing evidence the ground of abandonment by *willfully failing to visit* or make more than *token visitation* in the four months preceding the filing of the petition. However, we respectfully disagree with the trial court's finding that the Department proved the ground of abandonment by failing to *support* Dixie because the evidence fails to establish by clear and convincing evidence that the failure to support was *willful*.

The Department filed the petition to terminate Father's parental rights on March 18, 2011. Ms. Mosley testified that in the four months preceding the filing of the petition Father had visited only a few times and Ms. Fourqurean testified that Father was inconsistent with his visitation and he repeatedly cancelled visitation with little or no notice beforehand. Both Ms. Mosley and Ms. Fourqurean testified that they offered assistance to Father in scheduling and obtaining transportation for visitation, however, Father did not seek their help. Therefore,

we affirm the trial court's finding that the Department proved the ground of abandonment by willful failure to visit.

A parent who *willfully* fails to make reasonable payments toward the support of his child for the period of four months prior to the filing of the petition to terminate has abandoned the child. *See* Tenn. Code Ann. § 36-1-102(1)(A)(i). A "willful failure" of a parent to pay support under the termination statutes is "willful" if the parent is "aware of his or her duty to support, *has the capacity to provide the support*, makes no attempt to provide support, and has no justifiable excuse for not providing the support." *State Dept. of Children's Servs. v. Culbertson*, 152 S.W.3d 513, 524 (Tenn. Ct. App. 2004) (quoting *In re Adoption of Muir*, No. M2002-02963-COA-R3-CV, 2003 WL 22794524, at *5 (Tenn. Ct. App. Nov. 25, 2003)) (emphasis added). The Department filed the petition on March 18, 2011. Therefore, the relevant statutory period for determining this ground was December 18, 2010, to March 18, 2011. Father was not under an order to pay child support during this period; further, it is undisputed that Father was disabled, unemployed, and living on Social Security disability benefits of $680 per month during the relevant period and there is no evidence in the record that Father had the ability to provide financial support for Dixie during this period. Based upon the foregoing, we have concluded that the Department failed to establish by clear and convincing evidence that Father's failure to support Dixie was *willful*.[3] Therefore, the ground of abandonment for failing to support may not serve as a ground for terminating Father's parental rights.

## C. FAILURE TO ESTABLISH PARENTAGE

The trial court also found that Father's parental rights should be terminated on the ground of failure to establish paternity as set forth in Tennessee Code Annotated § 36-1-113(g)(9)(A), which provides that:

The parental rights of any person who, at the time of the filing of a petition to terminate the parental rights of such person or, if no such petition is filed, at the time of the filing of a petition to adopt a child, is not the legal parent or guardian of such child or who is described in § 36-1-117(b) or (c) may also be terminated based upon any one (1) or more of the following additional grounds:

---

[3]Although Father spent some of his income on cigarettes, which the trial court correctly found was money that could have been spent on Dixie, without more, this does not establish by the clear and convincing evidence standard that Father willfully failed to support Dixie.

(i) The person has failed, without good cause or excuse, to pay a reasonable share of prenatal, natal, and postnatal expenses involving the birth of the child in accordance with the person's financial means promptly upon the person's receipt of notice of the child's impending birth;

(ii) The person has failed, without good cause or excuse, to make reasonable and consistent payments for the support of the child in accordance with the child support guidelines promulgated by the department pursuant to § 36-5-101;

(iii) The person has failed to seek reasonable visitation with the child, and if visitation has been granted, has failed to visit altogether, or has engaged in only token visitation, as defined in § 36-1-102(1)(C);

(iv) The person has failed to manifest an ability and willingness to assume legal and physical custody of the child;

(v) Placing custody of the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child; or

(vi) The person has failed to file a petition to establish paternity of the child within thirty (30) days after notice of alleged paternity by the child's mother, or as required in § 36-2-318(j), or after making a claim of paternity pursuant to § 36-1-117(c)(3);

Tenn. Code Ann. § 36-1-113(g)(9)(A)(i)-(vi).

We have already discussed at great length in this opinion that Father failed to seek reasonable visitation with the child or merely engaged in token visitation. Thus, we affirm the trial court's determination that there was clear and convincing evidence to establish that Father's rights should be terminated based upon this ground as set forth in Tennessee Code Annotated § 36-1-113(g)(9)(A)(iii).

However, despite the Department's argument to the contrary, we find it important to note that based upon the circumstances of this case, Father's failure to file a petition to establish parentage would not be a sufficient ground for termination. In this action, Father was unaware that he was Dixie's father until the Department informed him and arranged for DNA testing to confirm this fact. Upon being confirmed as Dixie's biological father, Father did, at least initially, make efforts as outlined under the permanency plans to obtain custody

of his daughter. However, there is no evidence that the Department requested Father sign a voluntary acknowledgment of paternity nor was signing a voluntary acknowledgment of paternity made a requirement of his permanency plan as is often the case. Our Supreme Court discussed the obligations and efforts that are required of the Department related to establishing parentage in *In re Bernard T.*:

> As it did in this case, the Department frequently includes a provision in its permanency plans requiring putative fathers to establish their parentage of their children. This responsibility typically arises long before the Department files or even considers filing a petition to terminate the putative father's rights. Once a putative father assumes this obligation, our law provides him with several ways to accomplish this task. He may, for example, file a petition in a court of competent jurisdiction to establish his parentage in accordance with Tenn. Code Ann. § 36–1–102(28)(D), or he may execute a sworn voluntary acknowledgment of paternity in accordance with Tenn. Code Ann. § 24–7–113 (2000). Once a putative father undertakes either of these actions, he will be deemed to be the legal parent of the child who is the subject of the petition or acknowledgment.
>
> On the face of it, assisting a putative father with the execution of a voluntary acknowledgment of paternity pursuant to Tenn. Code Ann. § 24–7–113 does not appear to be unduly burdensome on the Department either in terms of time or resources. For biological fathers who decide to obtain a judicial determination of their paternity, the Department's obligation to use reasonable efforts to assist them includes (1) referring them to the appropriate court or referring them to other public or private agencies that can assist them in presenting their petition to the court and (2) providing them with whatever evidence the Department possesses that substantiates their claim. The Department is not obligated to provide putative biological fathers with a lawyer or with funding to retain a lawyer to represent them in a judicial or administrative proceeding to establish their parentage.

*In re Bernard T.*, 319 S.W.3d 586, 605-06 (Tenn. 2010) (footnotes omitted).

There is no evidence in this record to suggest that the Department made any effort to assist Father to establish parentage, and there is no evidence that the Department informed him that failing to establish parentage could be a basis for termination, yet the Department asserts this as a ground for termination. For the above reasons, we find it disingenuous for the Department to seek to terminate Father's parental rights on this ground. Moreover, it must be noted that when Father became aware this was a requirement – which he did not

know until it was asserted in the petition for termination of his parental rights, Father's attorney filed a motion to establish parentage.

### III. BEST INTEREST OF THE CHILD

Once the court determines there is at least one ground for termination, the court must conduct a best interests analysis using the statutory factors set forth at Tennessee Code Annotated § 36-1-113(i)(1)-(9). The statutory factors are not exclusive or exhaustive and other factors may be considered by the court. *See In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). We affirm the trial court's determination that it is in the best interest of the child for Father's parental rights to be terminated. Despite being offered assistance from the Department, Father failed to establish suitable housing, thus failing to make a reasonable adjustment of circumstances, conduct, or conditions to make it safe and in the child's best interest for Dixie to be in his home. Tenn. Code Ann. § 36-1-113(i)(1). Further, based upon Father's failure to participate in regular visitation with Dixie, who for most of her life was unaware of Father's status as her father, there was no evidence of a meaningful relationship being established between Father and Dixie. Tenn. Code Ann. § 36-1-113(i)(3)-(4). Instead, the testimony at trial indicated that Dixie considered her foster family as her family where she was able to reside with her four other siblings, separation from which would likely have a negative impact on Dixie's emotional and psychological condition. Tenn. Code Ann. § 36-1-113(i)(5). The best interest analysis is to be determined from the perspective of the child rather than the parent, and it is clear that it is in Dixie's best interest for Father's parental rights to be terminated. *See State of Tenn., Dep't of Children's Servs. v. L.H.*, No. M2007-00170-COA-R3-PT, 2007 WL 2471500, at *7 (Tenn. Ct. App. Dec. 3, 2007) (citing *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004)).

### IN CONCLUSION

After reviewing the record, we find that there is clear and convincing evidence to support the trial court's finding that three grounds to terminate Father's parental rights exist and that termination of Father's parental rights is in Dixie's best interest. Therefore, we affirm the trial court's termination of Father's parental rights. Costs of appeal are assessed against the Department of Children's Services due to Father's indigency.

_____
FRANK G. CLEMENT, JR., JUDGE